The next case is Amlong & Amlong v. Edcare Management. Ms. Amlong should be here for Amlong and Mr. Pollack for Edcare. And when you're ready, Ms. Amlong, you may begin. May it please the court, Judge Wilson, Judge Pryor, Judge Hutton. My name is Karen Kuhlman Amlong and I'm here representing the appellants in this case, which is an appeal from the imposition of sanctions in a $422,000 sanction under 1927 and also under the court's inherent powers. Well, the court hit you pretty hard with this sanction, $423,000. Yes, Your Honor, it did. But it determined that you unreasonably and vexatiously multiplied the proceedings and that opposing counsel is entitled to this amount. And you say that there are clearly erroneous findings of fact. There are 93 findings of fact, by the way. Yes, Your Honor, I do. There's a lot of findings of fact. And you point to some that you say are clearly erroneous findings of fact. And I guess my question, my first question is, let's say that you're right, that there are some erroneous findings of fact. You've identified several of them. But when I look at the remainder of the facts, the 93 findings of fact, they would appear to support the magistrate judge's conclusion. So the fact that there may be some evidence to support an alternative finding different from the one made by the magistrate judge is not enough to set aside the magistrate judge's decision. What do you have to say about that? I agree with that, Your Honor, completely. I'd like the court to look at the United States Supreme Court case of U.S. Bank v. Village of Lake Bridge. And it talks about the process that a court has to go through in analyzing factual findings and whether those factual findings do indeed support the conclusions of law that are made. And it distinguishes in two kinds of facts, historical facts, which are the who, what, when, where, how, and why, which are factual questions. And then there are mixed questions of law and fact, which determine whether those facts actually support the conclusion of law that is drawn from them. Now, the rules, the structure that we have for sanctions jurisprudence and sanctions litigation is pretty well defined. Those rules are set out, and there's really no equivocation. We agree with them. The appellees agree with those rules. The court has established them within the Eleventh Circuit. In this particular case, the historical facts of who, what, when, where, and how are almost largely disputed but supported and not clearly erroneous. The one historical fact that is not supported and is clearly erroneous is the why. And in the first paragraph of the trial judge's order, he explains and illustrates where and how he has made that why determination. And from there, I'll tell you why it was erroneous. He states, Deborah Eldridge visited the law firm of Amlong and Amlong PA for advice after she had been fired from her job at EdCare Management. At first, the Amlong firm did not believe that she had a very strong case. But after Eldridge explained that she had records that might reveal illegal activities by EdCare, the Amlong firm agreed to pursue her case for a probable payout. Commencing on that note, without a single demand ever having been made, without a single threat to use any document that EdCare claims was improperly taken by Ms. Eldridge, without any concrete evidence of any act or any word by any lawyer of the Amlong firm, the trial court implicitly recognized a sub salientio extortion plot. And that is where... I mean, I understand what you're saying about the why. I thought there was another why in there. And this was the one that is motivating me to give you a sense of where I'm coming from, is the request to return all company files. That's the real head scratcher for me and what seems, I think, is the key source of the sanctions and the key source of their amount. Judge Sutton, those files were returned as soon as they were ordered to be returned. All company files? All company files. All company files that the Amlong firm knew about were returned as soon as they were ordered to be returned by Judge Snow. Now, let's take a look at the facts before that. What about the copies? The copies were returned, too. Everything was returned. Not on the first request. No, it wasn't on the first request because the first request said, we want you to bring with us the files that were taken upon your termination. The facts are undisputed that on the day that Ms. Eldridge was terminated, she was escorted out of the building with no files in her possession whatsoever. And that request for files that she took upon her termination was repeated several times in the future, including in the pleadings that were filed in this lawsuit. Well, what about after Judge Snow's order? As I understand the facts, and correct me if I'm wrong, your client signed a declaration on pain of perjury that she had turned over all company property in her possession. She did. And I don't understand why you would let your client sign that without checking to see what was in the firm's possession. And as I understand it, and particularly because at this point there was a possibility of sanctions, as I understand it, there was still information in the firm's possession that had not been turned over. That is absolutely true, Judge Pryor. But when Judge Snow held her hearing, she said, turn over the documents, but you may keep copies. You may keep copies. And that's all the court, I'm sorry, that's all the Amlong firm ever did. They turned over every piece of paper, including things that were not company property, including checkbooks, including personal emails from years and years ago. Those were turned over in three bins, two jump drives, in a CD. Every single piece of document, every single piece of property that we knew. And this is undisputed. There is no question about this. As a matter of fact, Mr. Pollack states, Mr. Pollack states during the hearing, and this is on page 121 of the transcript of the hearing, we understand that everything Ms. Eldridge was able to find at that time did get dumped through the Amlong firm in November of 2013, aside from some stray documents that turned up later. Not the sort of thing it was based on. The issue is that they sat on the laptop and the CEO's contents of a laptop and the CEO's journal and handwritten journal for a year and a half. And that's true. But those documents were never requested in discovery. Number two, they were never replevened. And number three, they were never used for any purpose in this litigation, nor were there any documents in those documents that were relevant to the litigation. The CEO's CD-ROM, for example, and there is a printout of it. There were over 4,000 files in there. And those 4,000 files come from the year 2007 and before, way prior to the statute of limitations. There were two cases here. One was a FSLA case, which goes back two years or three years from the time it was filed. So the outside limit for that case was 2009. And the other one was an age and a gender discrimination case that was filed in 2013, I think. So these old, old documents had absolutely no relevance whatsoever to the case, were never used, were frankly just put on our server and forgotten about. They were brought as documents. They were scanned in, but there is no evidence anywhere that any document was ever used for any improper purpose in this litigation. But nonetheless... Yes? The district court magistrate judge conducted an evidentiary hearing and heard all this testimony and made a credibility evaluation. She did. And those are some of the findings that we have challenged because she makes comments about Mr. Amlong, for example, saying that he had no credibility, he used blue smoke and mirrors, but she never identified a single lie that he supposedly told, never identified any misrepresentation that he made, and goes on to find several paragraphs of factual findings that she relies upon as part of her order  to say that I don't believe these. She relies on them. She does the same thing with Ms. Daly. She said I forgot a lot, which is true. She says that she makes comments about her credibility also, but then she goes on once again to make a number of different findings based upon testimony that Ms. Daly gave. Now, perhaps the most important legal principle with regard to those credibility findings is that even though when credibility is the issue, those findings are entitled to great deference, they may be contradicted by documents or by objective evidence. In this case, there were written contracts that said nothing about a ketom action, which is the sub-solentio plot that supposedly the Amlong firm was engaged in. And the story is just basically implausible. They are relying on discredited testimony. The fact that the magistrate judge said, I don't believe what Mr. Amlong said. He used blue smokes and mirrors. And the discredited testimony of Ms. Daly, where the magistrate judge said she was evasive, to reach a contrary conclusion, which both Boese from the Supreme Court and Eckenrode from the Third Circuit say you can't do. She used the discredited testimony to draw a contrary conclusion. That is that they were motivated by this sub-solentio plot. I think I'm over my time, judges. Thank you very much. Thank you, Ms. Amlong. We'll hear from Mr. Pollack. May it please the court. Litigation is not easy. Lawyers face challenging circumstances. Lawyers face temptation. For our adversarial system to work, lawyers have to abide by certain fundamental rules. One of those rules, and we learned this early in life, is what belongs to others should be given others. In this case, from the very outset, Ms. Eldridge possessed a CD with the entire hard drive belonging to the CEO of ED Care Management. There was a civil theft demand letter. First, there was a letter asking for company property back, like the hanging files or whatever else was referred to. But then there was a civil theft demand letter that specifically requested the return of all company property. What the response was is telling, because it was the first piece of obfuscation. Ms. Daly of the Amlong firm writes, we don't know what you mean by company files. We'll return the original documents. And then has her client affirm that she returned original documents, whatever that meant. What she didn't say was, I should let you know, because it's only fair this property belongs to you, is that on the K drive at our law firm, we have the CEO's entire hard drive. Why isn't this attorney strategy? The National Employment Lawyers Association didn't file a green brief in this case. They argue that sanctions are always a last resort for the courts because it discourages remedial litigation, which is what they were considering here, remedial litigation. That sanctions cause more harm than good. You can look at the attorney's conduct in this case and make a conclusion that it amounts more to negligence than to recklessness or bad faith. Lawyers engage in this sort of gamesmanship all the time, don't they? They got socked with $423,000 sanction and ultimately, all of the files were returned to EdCare ultimately, and the litigation was resolved. Why can't we say that this is attorney negligence and not really, when you look at it, bottom line, bad faith on the part of the Amlong Law Firm? I think there are a few questions there I'd like to answer. One is they had the right to try to present this as a negligence case. They lost that. There were credibility determinations. Judge Otaza Reyes heard a full day of testimony, including half of that at least, by Mr. Amlong and Ms. Daly. Ms. Daly had to sit on a witness stand and explain what she meant when she used the word original and created obfuscation around the words company files. If we look at a situation like this and overrule a finding of bad faith, given the extremity of actually keeping an entire hard drive, we're not talking about making the difficult call on one or two documents or even a small category. They were in possession, illegal possession, of an adversary's full company information. It was the My Documents folder that contained everything. Ms. Eldridge stole before she went to Amlong, right? There may even be a dispute whether she stole it or found herself with it. I'm not sure that that's a material difference because what's important is if a client comes to me in possession of my adversary's property, I don't have the luxury as a lawyer to pick and choose and use it the way I want. I mean, they reached in and used org charts. They reached in and used documents when they wanted to, which is another reason why their excuses didn't hold water in front of the judges that heard the case at the trial level, including one who sat and listened to the testimony at length. Is this how whistleblower claims begin, with the employee bringing files to the lawyer's office? You know, I think some do. And I think there are protections for whistleblowers who are really whistleblowers. But when someone comes with, and the letter, it's a July 17, 2012 letter when Ms. Eldridge says to the Amlongs, here's a CD with the CEO's hard drive, the CEO's My Documents folder. It goes on to say, and I have audios of operational meetings. There might have been an opportunity for a lawyer to protect a whistleblower's rights, but that's not what happened here. And that doesn't give any lawyer the right to lie or to confuse the system or mislead judges for a lengthy period of time. Remember what happens even a year and a half into this when Judge Snow orders that every piece of company property be returned because there had been efforts to seek it all along, whether it's at depositions requesting, where are you getting that document? You have to give us all of these documents. Throughout the litigation, there were various efforts to get the company property. When Judge Snow orders it returned, this is almost as interesting or maybe as interesting as the use of the word original at the beginning of this. But there's a motion filed by the Amlong firm to get a copy of what they had to produce on a rushed basis. This is towards the end of these sets of issues. And I think Judge Pryor asked the question about, you know, you still had this copy back at the firm, and the Amlong firm defends itself by saying, well, we managed to get Judge Snow to say we can keep a copy of things, but then what do they do? They take the position that they don't have one. They actually file a motion to get access to get a copy of what they said was so voluminous that they had to collect it so quickly that it could not be copied when they already had in their system a full copy of the CEO's My Documents folder. Now, is that a – I mean, did they lie to the court there? Absolutely, Your Honor, and that's the finding by Judge Otaza-Reyes. That's the problem here. What was the lie, that they didn't have copies? The suggestion they didn't have copies. When they did, what they were doing was distancing the Amlong firm saying this was all a problem with our client. But it wasn't, and we know that from the beginning. There's even a statement made by Ms. Daley at some point trying to deny that she ever accessed these documents, except this is the rare case where we got insight into the attorney-client communications because the client waived attorney-client privilege here. So we actually got to see not only time records showing that they did review the boxes of materials despite denials of it at first, but that they as well were receiving communications saying I have all this property. It wasn't just an accidental here's a CD that somehow lands itself back with the file room and they upload it. These are direct communications from the client to the lawyer discussing these illegally withheld materials, even if they were obtained by accident, which I don't think any court had to limit itself to the inference that someone accidentally gets a CEO's hard drive. I think it's a fair inference that when someone knowingly possesses  How material was all this information to the underlying lawsuit? I mean, that gives an explanation for not keeping track of it. Well, one part of it is that from the early on we had a set-off defense for having stolen company property. Now, we didn't know it was the CEO's entire hard drive. But there are all sorts of risks that are accompanied by a company's full set of financial information. That's what Ms. Eldridge writes to the Amlong firm in July of 2012. It's the CEO's My Documents. It has financial information and much more. I have audio tapes of all the operational meetings. Now, if this was a fishing expedition to a key TAM action, maybe it's forgiven for some period of time. How did she do it? She copied his files? Is that what happened? Well, her testimony, which is largely credited by the magistrate, but not entirely, was essentially that she didn't recall how she got it. She ended up at the CEO's hard drive. Okay, fine. So that probably means she copied it, right? That would mean she copied it. Okay, so couldn't you have... I'm not a technology expert, but wouldn't one know if a set of documents had been copied? Isn't that something you can look at backwards in time and see what happened? It's nothing we were able to develop coming off of a particular laptop at a particular time. I'm not even sure that by the time we were litigating this it had come from the same laptop that the CEO was still using. So forensic-wise, I'm not sure. We certainly did not have evidence that she had taken everything. It was somewhat to our surprise, and contrary to what we were being told throughout the case, when we received three boxes, two thumb drives, and a disk in response to the November 7, 2013, order. I hope you set off claim pretty quickly. We did, knowing that there was some collection. We saw things popping up at depositions. We never thought it would be three boxes, two thumb drives, and a disk, including the CEO's entire hard drive. If I'm a lawyer and my client comes to me and says, look what I've got, I've got the CEO's entire hard drive. Let's go on a phishing expedition. I like to think that I have responsibilities, and I'm hoping that as final decisions come from this court that lawyers are steered in the right direction because not only here was the information not returned, but the stories that were told, the uses of words like original documents to hide that you're retaining these, filing motions along the way to say, give me access so we can copy these. We, as the firm, wouldn't know. It's all coming from Ms. Eldridge when it was actually at the firm the entire time, and somehow I guess we're being faulted because the hearing below is confidentiality to mediation. So, no, there's no hearing at which a threat is made. There's no deposition at which a threat is made, but I think it's fair inference for the court to draw from the record, as Judge Otazio-Reyes did, that with this information out there that would pop up at depositions, and that's certainly within findings of how we were figuring out they had documents that we had not produced in the litigation, I think we get... It's a fair inference that the plan they set in place, and this is what Ms. Eldridge testified to, Ms. Eldridge said, I went there to get my severance agreement looked at. She walked out with her 401K about to be depleted over the next several months, but the plan... She was told her claims were too weak to give up a $12,000 severance. She was told when she brought up illegal activities and having access to a CEO's entire hard drive that that's where they'd find their probable payout. That is the testimony. That is the testimony that was credited. That's... You're allowed... I mean, you might have fights about what you're allowed to take and what you're not, but that's how whistleblower cases go. Your only point would be the lawyer on the other side has to fess up when they have the information, but... Two things. That is how those whistleblower cases start. Well, two things. One is, your Honor's right, they have to fess up, and when there are requests, they have to produce documents. Now, we didn't say produce the CEO's entire hard drive, but we had many requests that would have called for the production of volumes of material within there. It's far-reaching material throughout the company. It's the CEO's entire hard drive. But that was being hidden, other than using a handful of documents they'd pull out from time to time. But I think what's more telling here is it was never really a key-tam action to be filed. So what you have, and this is the evidence that was at the hearing, you have a client who is saying, I know of illegalities. Now, there's nothing all that specific, and by the way, I don't think there ever were illegalities. But she said, I have all the financial information we're going to be able to put together. And Mr Amlong says to her, this is not only her testimony, but in a follow-up letter, it's rare to have this kind of insight, in a follow-up letter by her to the firm summing this up. And Judge Otazo-Reyes relies on that. But it says, we recognize that the FLSA and discrimination claims are weak, but those will be the first step. And what we'll really do is have the opportunity to use information that you put your legal minds to, to find from these documents. Not a, I know there was a big piece of fraud of this specific kind and some whistleblower act on that. This is a, let's rummage through until we find something we can threaten them with. And I think it's a fair inference from Ms Eldridge's testimony throughout the course of the hearing, not only Ms Eldridge's, but I think the several false denials along the way by Ms Daly and Mr Amlong about what they knew and saw that contradicts things like their own time records that they reviewed the boxes of materials. So we ended up fighting this case where from the outset, if the other side had been honest and given us these materials, the fair inference from Ms Eldridge's testimony is, she wouldn't have pursued the others. She would have preferred the $12,000 severance. If the... Let me ask you this, counsel. Sorry to interrupt. The magistrate judge concluded that the firm needlessly obstructed in several ways, but also said that the FLSA claims were frivolous ab initio. Um... Do we need to reach the question of whether the claims were frivolous ab initio to affirm the judgment here? I don't think the court has to find it's frivolous ab initio to affirm the judgment. It can find that, based on Ms Eldridge's testimony, those claims were weak. I would point, Your Honor, and I'll explain if I may. I see I'm about to run out of time. But I believe it's page 11 of Judge Otazo-Reyes' March 31, 2015 opinion and page 9 of our opposition brief. We detail the way in which Ms Eldridge was able to survive summary judgment. The documents were tremendously against her. I mean, she had depositions to say that almost not a single e-mail or document meant what it said. Typical summary judgment standards, that can sometimes help you squeak by. When you put it in the light of what happened at the outset of this case, and as Judge Scola said, called it an exceptional case within the meaning of Goodyear v. Hager, I think it's enough to find that it was a weak case that would not have been pursued by Ms Eldridge. And that's what she says, was the way she thought, except for the possibility of using stolen information to make threats that would get some type of a probable payout. I think we have your argument. Thank you, Mr. Pollack. Thank you. Judges, there are two important legal points to keep in mind. Number one, under the law of the 11th Circuit, the standard in frivolity is to view the evidence in the life most favorable to the non-prevailing party. That's number one. Number two, the law in the 11th Circuit also, is that this is not a subjective standard, bad faith. It is an objective standard. And yet, appellees would have you infer the motivation, which is that one little piece of historical fact that we say is clearly erroneous and undercuts everything else. They would have you infer the subjective motivation of the Amlong firm in the absolute absence of any objective evidence whatsoever that they ever intended to use any of the documents that were sitting on their hard drive or in their possession for any illegal term. Looking at the evidence in the light most favorable to them, it's exactly what they said. We had this stuff. We reviewed it, 2.6 hours, as a matter of fact, according to the time records. We determined that it was too old. It was stale. It had no use. We called Atlee Wampler and said, is this a King Tom action? He said, no. We didn't pursue it. And therefore, we just forgot about this stuff and left it there. Why did she ask for documents and copies of the documents? Not because she had stuff on her hard drive. She had already turned copies of that over to them. She had turned over the CD-ROM. She had turned over the thumb drives that had the plaintiff's 100-page document with hundreds of pages of supporting documents. We turned all that over to them. It was on the hard drive because we forgot. What we wanted, because there were discovery disputes going on, were the thousands and thousands and thousands of other pages that the testimony showed filled Ms. Eldridge's car. And she brought over late, after the time had expired, and we had to move for an extension of time. And because we wanted to comply with the court's order, we gave them to them without copying some of them. And so we had no record of what else we had given them. We knew we had given them the hard drive. Now, what's the harm? What's the harm in any of this? There was not a single document entered into evidence at the evidentiary hearing that shows that anything that was withheld, anything that was given late, including those 2,300 emails, there is not a single document that shows that there would have been any impact on the decision of the trial court to deny summary judgment. What about the offset claims? The offset claims, Your Honor, first of all, the offset was not even asserted in the original answer, which was after the first demand for the return of documents had been made. The first demand was made to Ms. Eldridge in May of 2008. We filed the FSLA claim in the fall of 2012. I'm just making the point. You were making a pretty sweeping argument that none of this was relevant to the case. And I'm saying it was relevant to the offset claims. That's not a timing question. I'm taking it on your terms. None of this was relevant. Okay. The original answer did not have an affirmative defense of offset. The amended answer had an affirmative defense of offset. When we asked for the amount of damages they were seeking, they had none. In their letters, they said it was $900. That was the value of the computer. I agree, Your Honor, there may have been some relevance to that, but that would be the only possible relevance, and they have not shown that there was any prejudice to them whatsoever. Absolutely none. There was not a document put into evidence at the hearing. There was not a document pointed to that showed that anything that Ms. Eldridge supposedly took ever was used in any improper way, with the exception of some org charts. I think what they would say is they valued it at $900 because they had no idea how much you had. But they got it all back, Judge. We gave it all back to them. When Snow ordered to give them back, we gave them back. In terms of materiality, it would have changed the amount of the offset claim to a lot more than $900. It never was litigated that way. You know, maybe it would have, but none of it was ever used, so where can you show, and where does the record here show, that there were any damages whatsoever? There were none. There is no showing in the record anywhere that there would have been any impact on that denial of summary judgment that the trial court said was replete with factual issues. There was a meritorious age claim under the Zabin case that we cited in the moving papers. Your Honours, I ask you to look at the case law and look carefully at these mixed questions of law and fact and see if the facts that were found in the order that the trial court affirmed support the requisite requirements. Thank you very much. Thank you. Ms. Avalon.